Patrick J. Hickey (Wyo. Bar No. 7-5522)
MOYE WHITE LLP
16 Market Square, 6th Floor
1400 16th Street
Denver, Colorado 80202
Phone: (303) 292-2900
Fax: (303) 292-4510
patrick.hickey@moyewhite.com

Patrick J. Bernal (*Admitted Pro Hac Vice*)
Joyce C. Williams (*Admitted Pro Hac Vice*)
MICHAEL BEST & FRIEDRICH, LLP
8300 Arista Place, Ste. 300
Broomfield, Colorado 80021
Phone: (303) 800-1580
Fax: (855) 732-0199
pjbernal@michaelbest.com
jcwilliams@michaelbest.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

|  |  |
|---|---|
| PPEX, LLC, | |
| *Plaintiff,* | Case No.: 21-cv-53-NDF |
| v. | |
| Buttonwood, Inc. d/b/a bttn., Jake Garwood, and Jack Miller, | |
| *Defendants.* | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT (ECF No. 91)

# TABLE OF CONTENTS

I.      SUMMARY OF THE ARGUMENT ........................................................................ 1

II.     RESPONSE TO DEFENDANT'S STATEMENT OF FACTS ................................... 2

III.    PPEX'S STATEMENT OF ADDITIONAL MATERIAL FACTS .............................. 9

IV.     STANDARD OF REVIEW ................................................................................... 12

V.      ARGUMENT ....................................................................................................... 13

        A.      The Court's Preliminary Injunction Findings Are Not
                Binding at Trial on the Merits. ............................................................. 13

        B.      PPEX Took Reasonable Measures to Protect the Trade
                Secrets Misappropriated by Bttn. ......................................................... 15

        C.      Bttn's Misappropriation of PPEX's Trade Secrets Caused
                Damages. ................................................................................................ 17

        D.      As this Court Has Twice Determined, the Mutual Release
                Does Not Bar PPEX's Claims. ............................................................... 20

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All W. Pet Supply Co. v. Hill's Pet Prods. Div.*,
  840 F. Supp. 1433, 1437 (D. Kan. 1993) ............................................................. 15

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242, 248 (1986) ................................................................................... 12

*Armenian Assembly of Am., Inc. v. Cafesjian*,
  692 F. Supp. 2d 20, 43 (D.C. Cir. 2010) ............................................................ 18

*AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*,
  663 F.3d 966, 974 (8th Cir. 2011) ...................................................................... 16

*Breen v. Pruter*,
  2015 U.S. Dist. LEXIS 144513, at *7 (D. Wyo. Aug. 6, 2015) ............................ 13

*Dahl v. Charles F. Dahl, MD., P.C. Defined Ben. Pension Trust*,
  744 F.3d 623, 628 (10th Cir. 2014) .................................................................... 12

*DUSA Pharms., Inc. v. Biofrontera Inc.*,
  2020 U.S. Dist. LEXIS 187573, at *6 (D. Mass. Oct. 9, 2020) ............................ 18

*Fish v. Schwab*,
  957 F.3d 1105, 1140 (10th Cir. 2020) ............................................................ 13, 14

*Harvey Barnett, Inc. v. Shidler*,
  338 F.3d 1125, 1129 (10th Cir. 2003) ................................................................. 15

*Henry v. Merck & Co.*,
  877 F.2d 1489, 1495 (10th Cir. 1989) ................................................................. 18

*Hertz v. Luzenac Group*,
  576 F.3d 1103, 1114 (10th Cir. 2009) ................................................................. 16

*Homan v. City of Albuquerque*,
  336 F.3d 900, 904 n.5 (10th Cir. 2004) ............................................................... 14

*In re Innovative Constr. Sys., Inc.*,
  793 F.2d 875, 884 (7th Cir. 1986) ....................................................................... 16

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
  342 F.3d 714, 724 (7th Cir. 2003) ....................................................................... 16

*National Audubon Society, Inc. v. Davis*,
   307 F.3d 835 (9th Cir. 2002) ................................................................................. 13

*Reed v. Bennett*,
   312 F.3d 1190 (10th Cir. 2002) ............................................................................. 13

*Sinclair Wyo. Ref. Co. v. Infrassure Ldt*,
   2017 U.S. Dist. LEXIS 119145, at *7 (D. Wyo. Mar. 10, 2017) ........................... 12

*Snyder v. Beam Techs.*,
   2021 U.S. Dist. LEXIS 207686, at *18-19 (D. Colo. Aug. 16, 2021) .................... 17

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ............................................................................................. 19

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390, 395 (1981) ..................................................................................... 13

**RULES**

FED. R. CIV. P. 56 …………………………………………………………………………...11, 12

# I. SUMMARY OF THE ARGUMENT

Through its reliance on self-serving testimony and written discovery responses, at an early stage of the litigation, Defendant Buttonwood, Inc. d/b/a bttn ("Bttn") suggests there is no genuine issue of material fact and that it is entitled to summary judgment. Bttn's arguments are misplaced and should be rejected.

First, the "law of the case doctrine" does not support a court applying its "likelihood of success" preliminary injunction findings to a final determination on the merits. This is particularly true, where, as here, the findings Bttn would have this Court adopt relate to questions of fact—*not* law—to be determined by a jury at a trial on the merits.

Second—despite the unusually early procedural posture for a summary judgment motion (the fact discovery cutoff date is May 11, 2022 [*see* ECF No. 81, at p. 4])—there is already substantial evidence of (i) the reasonable measures PPEX utilized to protect its trade secrets; (ii) Bttn's misappropriation of these trade secrets; and (iii) the damages caused by this misappropriation. Indeed, both of Bttn's co-founders—Garwood and Miller—executed documents acknowledging this confidentiality, as did nearly every other PPEX employee. Garwood, in particular, signed PPEX's amended operating agreement which expressly identifies its Customer and Supplier Lists as a confidential business asset. Despite such express acknowledgment, Garwood and Miller supplied these misappropriated trade secrets to their new company, Bttn. Bttn then utilized PPEX's trade secrets to solicit PPEX's customers which, in turn, caused

damages. (PPEX expects causation and damages to be further developed through fact and expert discovery.)

Finally, Bttn rehashes its repeated contention that PPEX and Garwood's mutual release bars PPEX's claims against Bttn. The Court has twice rejected this argument and should (again) find that this mutual release does not bar PPEX's claims in this litigation.

Ultimately, Bttn has not and cannot show that it is entitled to summary judgment. For these reasons, as further set forth herein, Bttn's Motion should be denied.

## II. RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.     PPEX was formed on April 2, 2020 and is a technology company that utilizes blockchain technology to connect customers of personal protective equipment ("PPE"), like hospital associations and other large-scale purchasers, with verified suppliers of PPE.

**Response**: Admitted. Further responding, in addition to PPE, PPEX also sells sanitation products, surgical products and a wide range of medical equipment. (*See* Declaration of J. Deichmann, at ¶ 3, attached as **Exhibit 1**.)

2.     PPEX runs an "open marketplace," meaning that it does not control the buyers or the product listings on the website, nor does it take inventory, buy or sell the products directly. No products listed on the PPEX platform are "PPEX Products" in the eyes of the customer.

**Response:** PPEX admits that a portion of PPEX's sales are run through an "open marketplace" which connects customers of PPE with verified suppliers. However, PPEX denies that it "does not control the buyers or the product listings

2

on its site." Before making a purchase or selling a product, PPEX's buyers and sellers are first verified to ensure their needs and legitimacy. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 4.) PPEX further denies that it does not "take inventory, buy or sell the products directly." For most of its group orders, it purchases the product, takes inventory, and stores the products in a warehouse prior to distribution. (*Id.*, at ¶ 5.)

3.      PPEX makes profit from a stated 3% transaction fee from each purchase made with a distributor on their [*sic*] platform, in exchange for hosting the marketplace. PPEX only allows distributors to sell PPE products on its platform, as indicated by the name, PPE.Exchange.

**Response:** PPEX admits that a portion of its profits are made from a 3% transaction applied to purchases made with a distributor on its platform. However, PPEX denies that it only allows distributors to sell PPEX on its platform, and further denies that this 3% transaction fee is the only way in which it makes a profit. (*See supra*, Response to Fact No. 2.)

4.      From approximately May 24, 2020 to January 29, 2021, former defendant JT Garwood served as PPEX's Chief Operating Officer.

**Response:** Admitted.

5.      From approximately July 20, 2020 to February 1, 2021, former defendant Jack Miller served as PPEX's Director of Logistics.

**Response:** Admitted.

6.      PPEX employees contributed to PPEX's lists of potential customers and

3

suppliers (the "Customer and Supplier Lists"). Members of the sales team had access to the Customer and Supplier Lists, which were widely distributed at PPEX, using their personal computers.

**Response:** PPEX admits that certain PPEX employees[1] had access to the Customer and Supplier Lists and contributed to these lists as it was their job to do so. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 14.) PPEX further admits that, as Chief Operating Officer, Garwood had access to the Customer and Supplier Lists. (*Id.*)

7.     Mr. Garwood and Mr. Miller contributed to PPEX's Customer and Supplier Lists during their employment at PPEX.

**Response:** Admitted.

8.     The only step PPEX took to protect its Customer List was to require login credentials.

**Response:** PPEX denies that the only step it took to protect its Customer List was to require login credentials. PPEX's Customer List was maintained on MailChimp. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 14.) Only Garwood, Russell Decker, and Jake Deichmann had login credentials to access MailChimp. (*Id.*)

In an effort to maintain the confidentiality of its trade secrets, with the exception of Decker, Deichmann, and Garwood, all other PPEX employees signed confidentiality and non-disclosure agreements, including Jack Miller. (*Id.,*

---

[1] "Employees" shall mean both W2 employees and 1099 contractors employed by PPEX.

4

at ¶ 10**.**) PPEX's standard NDA Agreement required its employees not to disclose any "Confidential Information" which includes any "information and materials, whether oral, written or in any form whatsoever, of the other that may be reasonably understood . . . to be confidential and/or proprietary." (*Id.*, at ¶ 12.) PPEX's employees widely understood the Customer and Supplier Lists to be confidential, and were regularly reminded that PPEX's Customer and Supplier Lists (and its business model in general) was not to be shared with anyone outside of PPEX. (*Id.*, at ¶¶ 13, 15.)

Garwood also signed PPEX's Amended Operating Agreement which includes "Business Assets" within its definition of Intellectual Property. (*Id.*, at ¶¶ 17-18.) The Amended Operating Agreement includes "customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or propriety information relating to the Technology" within its definition of "Business Assets." (*Id.*, at ¶ 19.) Such "Business Assets" are encompassed within each Member's "Assigned Assets," and such "Assigned Assets" were assigned to PPEX as part of each Member's capital contribution. (*Id.*, at ¶ 20.) Garwood and PPEX's co-founders Deichmann and Decker frequently discussed and understood the need to maintain the confidentiality of PPEX's Customer and Supplier Lists. (*Id.*, at ¶ 21.)

9.      Mr. Garwood and Mr. Miller had no formal agreements whatsoever while employed with PPEX, including agreements regarding rights in the Customer and Supplier Lists or even regarding their employment status.

**Response:** Denied. (*See supra*, Response to Fact No. 8.)

10.     Likewise, PPEX did not take any steps—including any communications or notice—to inform employees, including Mr. Garwood and Mr. Miller, that the Customer and Supplier lists were trade secrets. For example, no documents were marked as confidential, there were no confidentiality agreements with employees, and PPEX never otherwise informed Mr. Garwood or Mr. Miller that PPEX considered the Customer and Supplier Lists to be propriety or confidential.

**Response**: Denied. (*See supra,* Response to Fact No. 8.)

11.     A few months after joining PPEX, Mr. Garwood tried to implement a requirement for new hires to sign a nondisclosure agreement, but the other PPEX founders did not support it. Because the other co-founders did not support Mr. Garwood's attempts to implement confidentiality protections with new hires, it was implements with respect to only a handful of new hires.

**Response**: Denied. (*See supra,* Response to Fact No. 8.)

12.     In negotiating the settlement agreement and release (discussed below) with Mr. Garwood, PPEX did not address whether the Customer and Supplier Lists were confidential and, if so, what Mr. Garwood's obligations were with respect to them.

**Response**: PPEX admits that the settlement agreement and release do not directly address the confidentiality of PPEX's Customer and Supplier Lists. However, the settlement agreement directly references PPEX's Amended Operating Agreement, in which, as set forth *supra* in Response to Fact No. 8, Garwood acknowledged that PPEX's "Business Assets" encompass "customer

and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or propriety information relating to the Technology."

13.     There is no written document communicating to Mr. Garwood that the Customer and Supplier Lists were proprietary or confidential.

**Response:** Denied. (*See supra*, Response to Fact No. 8.)

14.     Ultimately, prior to the filing of this lawsuit, PPEX did not in any way communicate or place Mr. Garwood or Mr. Miller on notice, that it considered the Customer or Supplier Lists to be propriety or confidential.

**Response:** Denied. (*See supra*, Response to Fact No. 8.)

15.     On January 17, 2021, PPEX arranged a buyout plan for Mr. Garwood where PPEX agreed to buy his purported membership interest in PPEX, but left the determination of any future role for Mr. Garwood, either as an employee or contractor, at the discretion of PPEX. PPEX and Mr. Garwood executed a Settlement Agreement and Mutual Release on January 26, 2021. The Settlement Agreement and Mutual Release does not reference or include a nondisclosure agreement, noncompete agreement, or any other protective language.

**Response:** Admitted. (*See also supra*, Responses to Facts Nos. 8 & 12.)

16.     On January 29, 2021, PPEX terminated Mr. Garwood.

**Response:** Admitted.

17.     On February 1, 2021, Mr. Miller quit his term as an independent contractor at PPEX.

**Response:** Admitted.

7

18.     In January and February 2021, PPEX lost its entire sales team.

**Response:** Admitted.

19.     After terminating Mr. Garwood and losing other sales team employees in January and February 2021, PPEX did not hire new sales team employees.

**Response**: Admitted.

20.     Instead of replacing the sales team it lost, PPEX's Chief Executive Officer, Jake Deichmann, added sales to his existing responsibilities. Mr. Deichmann has a background in engineering, not sales.

**Response**: PPEX admits that Deichmann added sales to his existing responsibilities but denies that Deichmann's background is limited to engineering. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 3.) Both Deichmann and Decker have backgrounds in sales. (*Id.*; *see also* ECF No. 91-2, at 60:14-24.)

21.     PPEX also shifted a non-sales employee to focus on sales.

**Response:** Admitted.

22.     On February 2, 2021, Mr. Garwood and Mr. Miller formed Buttonwood, Inc. d/b/a bttn.

**Response:** Admitted.

23.     Bttn is a medical supply distributor. Bttn has an e-commerce store that is purchased from Shopify (the largest marketplace technology company in the world), where customers can check out.

**Response:** PPEX has insufficient information to admit or deny this allegation.

24.     Bttn runs a "closed marketplace," meaning that it purchases its own

8

products and resells them to customers. Bttn Sells a wide variety of medical supply products, including dental, medical, and surgical supply products.

**Response:** PPEX has insufficient information to admit or deny this allegation.

25.     Because of PPEX's failure to communicate to or notify Mr. Garwood and Mr. Miller that it considered the Customer and Supplier lists to be confidential, Bttn did not know, nor should it have known, that Mr. Garwood and Mr. Miller retained the Customer and Suppliers Lists improperly or were using the Lists improperly for Bttn's benefit.

**Response:** Denied. (*See supra,* Responses to Facts Nos. 8 & 9.)

### III. PPEX'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**i.      Bttn's Use of PPEX's Trade Secrets.**

A.     Bttn is a direct competitor of PPEX, offering identical services and holding itself as utilizing the same novel business as PPEX. (*Compare* "Our Mission," PPEX Website ("The platform focuses on reliability, verification of vendors, and their products to combat industry wide friction points such as fraudulent products, price-gouging, and large minimum order quantities."), attached as **Exhibit 2,** *with* "Our Story," Bttn Website ("Knowing that there were shortages and a disturbing amount of fraud impacting supplies, we built a technology platform to source, verify, and distribute PPE to millions of frontline workers . . ."), attached as **Exhibit 3**.)

B.     Julianna Gordon served as a Business Development Manager for PPEX from September 12, 2020 to February 17, 2021. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 11.)

C.      Daniel Black served as a Business Development Manager for PPEX from November 1, 2020 to February 18, 2021. (*Id.*)

D.      On February 23, 2021—*i.e.*, less than a week after Gordon and Black left PPEX—Garwood emailed Gordon and Black and made plans to utilize PPEX's Customer and Supplier Lists for the benefit of Bttn. (*See* ECF No. 1, at ¶ 40 & ECF No. 1-2.)

E.      In this email, Garwood told Gordon and Black to "[g]et phone time with your customers[,] [e]ven if you spoke with them last week, it's a good time to get time with them as bttn." (*Id.*)

F.      Garwood also reminded Gordon and Black "that Dental, Senior Living, and similar types of orgs made more money for us than any other, so why not double down now?" (*Id.*)

G.      As no entities had purchased PPE from Bttn prior to February 2021, it was PPEX—*not* Bttn—who had made money from these organizations. (*See* ECF No. 91-3, at Response to Request to Admit No. 1.)

H.      Afterward, Gordon utilized the Customer List to schedule a meeting PPEX's customer the West Virginia Hospital Association for March 4, 2021, while continuing to hold herself out as a PPEX employee on LinkedIn. (*See* ECF No. 1, at ¶¶ 41-42 & ECF Nos. 1-3, 1-4.)

I.      Bttn has since used the proprietary information contained in PPEX's Customer List to send email blasts and offer PPEX's customers various targeted discounts it they purchase their PPE through Bttn. (*See* ECF No. 1, at ¶¶ 43-44 & ECF

Nos. 1-5, 1-6; *see also* ECF No. 69, at p. 11 ("[Bttn] does not appear to seriously dispute that its email distribution list contains or was originally based on Plaintiff's Customer List.").)

J.      For example, prior to Bttn's formation, PPEX had partnered with the Washington PPE Purchasing Co-Op which included the sale of N95 respirators, 3 ply surgical masks, and surgical gowns. (*See* **Ex. 1,** Deichmann Declaration, at ¶ 22.)

K.      Shortly after Bttn was formed, the Washington Co-Op stopped using PPEX's platform and instead partnered with Bttn to purchase the same items. (*Id.,* at ¶ 22.)

L.      Upon information and belief, Bttn targeted and obtained business from this former PPEX partnership, using PPEX's proprietary Customer Lists, which contained such information as these customers' purchase histories and detailed contact information. (*Id.,* at ¶ 24.)

ii.      **Bttn's Refusal to Participate in Discovery.**

M.      On September 17, 2021, PPEX's counsel requested dates for the depositions of Garwood and Miller.

N.      Having received no response to several follow-up requests, on October 4, 2021, PPEX's counsel sent Bttn's counsel notices for the depositions of Bttn, Garwood, Miller, Gordon, and Black to take place over a span of four days in mid-November 2021.

O.      On November 5, 2021, PPEX's counsel sent Bttn's new counsel courtesy copes of the deposition notices.

P.      Bttn's new counsel then informed that those witnesses were unavailable

on the noticed dates, refused to offer any additional dates until mid-January 2022, and threatened to move for a protective order if PPEX did not withdraw its notices.

Q.     Additionally, on September 14, 2021, PPEX issued its first set of written discovery to Bttn.

R.     After PPEX agreed to an extension, Bttn served its responses on November 4, 2021.

S.     In its discovery responses, Bttn refused to respond to several requests on purported relevancy grounds and the parties are currently engaged in conferral efforts in an attempt to resolve this discovery dispute without the need for Court intervention.

## IV. STANDARD OF REVIEW

Summary judgment is only appropriate if the pleadings and admissible evidence produced during discovery, together with any affidavits "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Sinclair Wyo. Ref. Co. v. Infrassure Ldt*, 2017 U.S. Dist. LEXIS 119145, at *7 (D. Wyo. Mar. 10, 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.*

In considering the motion, the Court views the record and draws all reasonable inferences in the light most favorable to the non-moving party. *Dahl v. Charles F. Dahl, MD., P.C. Defined Ben. Pension Trust*, 744 F.3d 623, 628 (10th Cir. 2014). "The movant

always has the initial burden to show the district court the basis for its motion," and

"must identify those parts of the 'pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any' which 'demonstrate the absence

of a genuine issue of a material fact.'" *Breen v. Pruter*, 2015 U.S. Dist. LEXIS 144513, at *7

(D. Wyo. Aug. 6, 2015) (quoting *Reed v. Bennett*, 312 F.3d 1190 (10th Cir. 2002)). "If the

movant fails to meet its initial burden, the burden never shifts to the non-movant, and

the motion fails." *Id.*

## V. ARGUMENT

### A.   The Court's Preliminary Injunction Findings Are Not Binding at Trial on the Merits.

As cited by the Court in its order, "the findings of fact and conclusions of law

made by a court granting a preliminary injunction are not binding at trial on the

merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); (*see also* ECF No. 69, at p. 9 &

n.5.) Indeed, because preliminary injunctions are granted and denied "on the basis of

procedures that are less formal and evidence that is less complete than a trial on the

merits," a party "is not required to prove his case in full at a preliminary-injunction

hearing." *Id.* As such, the "normal rule is that [r]ulings—predictions—as to the likely

outcome on the merits made for preliminary injunction purposes do not ordinarily

establish the law of the case." *Fish v. Schwab*, 957 F.3d 1105, 1140 (10th Cir. 2020)

(citations omitted).

Undeterred by this "normal rule," Bttn cites *Fish* for the proposition that the

Court's denial of PPEX's motion for preliminary injunction "is the law of the case and

warrants summary judgment on [PPEX's] claims." (Doc. 91, at p. 2.) However, the "law

of the case" considered and adopted in *Fish* was limited to an "opinion discussing pure issues of law" in the context of a federal voter registration law found to have preempted a Kansas law requiring documentary proof of citizenship. *Fish*, 957 F.3d at 1141 (noting that "an opinion that robustly addresses legal issues at the preliminary-injunction stage of the litigation will provide the district court with the appropriate legal framework within which to view th[e] case.") (internal citations omitted).

Here, Bttn is not asking the Court to adopt an opinion "discussing pure issues of law" or even one that "robustly addresses legal issues." Instead, Bttn is asking the Court to adopt limited factual findings based on an incomplete record before any discovery had been exchanged.[2] At that early stage of the case, and in the limited context of a preliminary injunction motion, the Court merely found that PPEX had not made a strong showing that it was likely to succeed on the merits and thus declined to issue an injunction. But as set forth *infra*, there certainly is a genuine dispute as to the limited findings Bttn would have the Court adopt.

These limited findings are not the "law of the case" and is thus not appropriately applied to the overall merits of PPEX's claims. *See Fish*, 957 F.3d at 1141 (quoting *Homan v. City of Albuquerque*, 336 F.3d 900, 904 n.5 (10th Cir. 2004)) ("To the extent that any language in [the Court's order] c[an] be read as an assessment of the actual merits of

---

[2] Notably, although the hearing occurred several months after PPEX's Verified Complaint and Motion for Preliminary Injunction were filed, the delay occurred due to the need to adjudicate Bttn's numerous motions as well as COVID-19 complications—*i.e.*, not because that parties were busy engaging in discovery in order to develop a complete record.

[the plaintiff's] claim, as opposed to [its] likelihood of success on the merits, such language [is] dicta" and "not subject to the law of the case doctrine.").

### B. PPEX Took Reasonable Measures to Protect the Trade Secrets Misappropriated by Bttn.

As this Court noted, "written nondisclosure agreements with employees are not always necessary to show an employer took reasonable measures to protect trade secrets." (ECF No. 69, at p. 20.) However, virtually all of PPEX's employees—including Miller—did, in fact, execute NDAs. (*See supra*, at Sec. II, Response to Fact No. 8.) PPEX's employees also widely and reasonably understood PPEX's Customer and Supplier Lists[3] to be confidential and proprietary information subject to the NDAs. (*Id.*) Furthermore, the Customer List was maintained on PPEX's MailChimp account to which only Garwood, Decker, and Deichmann had login credentials. (*Id.*)

For his part, Garwood signed PPEX's Amended Operating Agreement thereby acknowledging that PPEX considered its "Business Assets" to be intellectual property, and that its "Business Assets" encompass "customer and supplier lists, price lists, mailing lists, customer and supplier records and other confidential or propriety information relating to the Technology." (*Id.*) Garwood, Decker, and Deichmann also

---

[3] As this Court has acknowledged, PPEX has "made a strong showing that its compilations of customer and suppliers' affiliations, regulatory status, and specific purchase or sale histories . . . has economic value in not being generally known or accessible," and thus constitutes a trade secret. (ECF No. 69, at p. 18.) But even so, "[t]rade-secret status is a question of fact." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003); *see also All W. Pet Supply Co. v. Hill's Pet Prods. Div.*, 840 F. Supp. 1433, 1437 (D. Kan. 1993) ("The existence of a trade secret under the Uniform Trade Secrets Act is a question of fact for determination by the trier of fact.").

frequently discussed and understood the need to maintain the confidentiality of PPEX's business model and Customer and Supplier Lists. (*Id.*)

Having both express and verbal knowledge and understanding of the proprietary nature of PPEX's Customer and Supplier Lists, Garwood and Miller nevertheless supplied these trade secrets to their new company, Bttn. Bttn then utilized PPEX's trade secrets to get a head start into the marketplace and solicit PPEX's customers and suppliers. (*See supra,* at Sec. III; *see also* ECF No. 69, at p. 11.)

Ultimately, a reasonable jury could find that the measures taken by PPEX to protect its trade secrets were reasonable. *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 884 (7th Cir. 1986) (noting that the factfinder considers "the size and nature of [the plaintiff's] business, the cost to it of additional measures, and the degree to which such measures would decrease the risk of disclosure," and "[w]hat may be reasonable measures in one context might not necessarily be so in another"); *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 724 (7th Cir. 2003); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) ("Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required.") And resolving whether PPEX took reasonable measures and whether Bttn improperly acquired and used PPEX's trade secrets are both issues for the jury and inappropriate for determination on summary judgment. *See Hertz v. Luzenac Group*, 576 F.3d 1103, 1114 (10th Cir. 2009) ("Whether [plaintiff's] customer list was easily ascertainable from public sources and whether [plaintiff] took reasonable means to guard the secrecy of this list ordinarily would be questions for a jury"); *Learning Curve Toys*, 342 F.3d (noting

that "only in extreme circumstances can what is a 'reasonable' precaution be determined as a matter of law") (internal citations omitted); *Snyder v. Beam Techs.*, 2021 U.S. Dist. LEXIS 207686, at *18-19 (D. Colo. Aug. 16, 2021) (recognizing "that the reasonableness of the protective measures taken to secure the secrecy of trade secrets is a question best reserved for a jury"); (*see also* ECF No. 69, at p. 21-22).

### C.  Bttn's Misappropriation of PPEX's Trade Secrets Caused Damages.

Bttn summarily contends that, because PPEX lost its sales team and had started to lose sales before Bttn was created (but after Garwood left the company), PPEX cannot establish that Bttn's misappropriation of trade secrets has caused damages. This argument fails.

First, as Bttn acknowledges, "[c]ausal chains may have more than one link." (ECF No. 91, at 14.) Therefore, even if PPEX lost revenue after its head of sales (Garwood) left, that does not mean that PPEX did not *also* lose revenue because Bttn began using PPEX's trade secrets. One thing does not preclude the other. As PPEX's CEO testified at the preliminary injunction hearing, he attributed the company's drop in sales "to our head of sales leaving ***and then targeting all those customers***." (*See* ECF No. 91-2, at 60:6-61-7) (emphasis supplied); (*see also supra*, at Sec. III, Facts A-L).

Second, Bttn misrepresents the record with respect to PPEX's alleged failure to replace its sales team, assuming this "failure" would preclude PPEX from recovering damages, which PPEX disputes. (*See* ECF No. 91, at 15.) ("PPEX's CEO, instead, simply added sales to his existing list of duties and transitioned a non-sales employee to sales.") In fact, PPEX "brought on a sales consultant" and "repurposed a couple of

17

employees," *i.e.*, not just one employee. (*See* ECF No. 91-2, at 60:6-61-7.) Also, PPEX's

CEO does have a background in sales, contrary to Bttn's motion argument. (*See supra*, at

Sec. II, Response to Facts Nos. 20-21.) It would also be manifestly unfair to punish PPEX

for not replacing its sales team *in toto* when its fiscal inability to do so was caused by the

wrongful acts of the Defendant. At most, Bttn's argument in this regard should be

reserved for trial, when Bttn could (theoretically) argue for a reduction in damages due

to an alleged failure to mitigate damages. Certainly, this argument is insufficient to

defeat PPEX's claims outright at the summary judgment stage. *See Henry v. Merck & Co.*,

877 F.2d 1489, 1495 (10th Cir. 1989) ("Generally, the question of proximate cause is one

of fact for the jury."). The determination of whether Bttn's misappropriation of PPEX's

trade secrets caused PPEX damages is not appropriate for summary disposition. *See,*

*e.g.*, *DUSA Pharms., Inc. v. Biofrontera Inc.*, 2020 U.S. Dist. LEXIS 187573, at *6 (D. Mass.

Oct. 9, 2020) ("[W]hether [plaintiff] can prove entitlement to lost profits for

[defendant's] sales as a result of the alleged trade secret misappropriation and other

alleged tortious conduct is a question of causation for the factfinder."); *Armenian*

*Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 43 (D.C. Cir. 2010) ("[W]hether

[plaintiff's] losses were proximately caused by Defendants' conduct is a question of fact,

so summary judgment on this basis is inappropriate.").

Additionally, the case law that Bttn cites in this section of its motion does

nothing to further Bttn's position. *National Audubon Society, Inc. v. Davis* dealt with the

standing of Audubon Society members to challenge a proposition that led the federal

government to remove wildlife traps, which then led to a greater number of predators,

"which in turn decrease[d] the number of birds and other protected wildlife" that the members could enjoy. 307 F.3d 835, 849 (9th Cir. 2002), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002). Even in those circumstances (with two intervening causes), the members had experienced an "injury in fact" for standing purposes relating to passage of the proposition. *See id.* Here, the causal chain is much cleaner and more direct than in *Davis*.

Likewise, in *Story Parchment Co. v. Paterson Parchment Paper Co.*, the Supreme Court reversed a judgment, which refused to sustain the damages recovered in an antitrust action, and affirmed the judgment entered by the district court because the proof was sufficiently certain to support the jury's verdict. 282 U.S. 555 (1931). In other words, this decision supports upholding damage awards against claims that the damages are insufficiently clear or definite to be compensable. Certainly, *Story Parchment* does not lend any support to Bttn's argument that a trade secret corporate defendant has not caused any damages, because those damages are *also* attributable to related actions of the corporate defendant's president.

Finally, there is substantial evidence that Bttn has targeted PPEX's customers and utilized the proprietary information contained in PPEX's Customer List to offer them pointed discounts. (*See supra*, at Sec. III, Facts A-L.) PPEX also expects that its expert report—not yet filed or due—will help establish the causal link between the subject misappropriation and damages.

**D.  As this Court Has Twice Determined, the Mutual Release Does Not Bar PPEX's Claims.**

In its Order denying Bttn's Motion to Reconsider Order Denying Motion to

Dismiss or Stay the Case, the Court found:

- Bttn is not a party to the either the settlement agreement or the mutual release agreement," and consequently, "its efforts to avoid defense of this action based on agreements to which Bttn is a stranger is unavailing.";

- "The fact that an arbitrator is empowered to decide the scope of the general release does not create any apparent error in this Court's ruling that the scope of both arbitration clauses is clear and does not extend to the matters pled in Plaintiff's complaint," and that "Bttn cannot simply disagree with this Court's order to bootstrap this dispute into an arbitration under agreements that apply to others."

(*See* ECF No. 80, at pp. 2-3.)

The Court also previously found that:

The scope of both arbitration clauses is clear. The settlement agreement covers controversies and claims related only to that agreement. That agreement only concerns the representations and promises contained therein which include, in part, Garwood's forfeit of his right to receive membership interests in exchange for payment by Plaintiff. The settlement agreement does not address in any way confidential information, trade secrets or the alleged formation by Defendants of a direct competitor. Consequently, the dispute resolution clause requiring binding arbitration does not include within its scope the matters pled in Plaintiff's complaint.

(*See* ECF No. 33 at pp. 6-7.)

Here, Bttn rehashes the same failed argument which should (again) be rejected.

Bttn is still not a party to the mutual release, and the mutual release's arbitration clause

still does not include within its scope the matters pled in PPEX's complaint, and thus

any argument that this dispute is subject to arbitration is unavailing.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied.

Dated this 29th day of December, 2021.

/s/ Patrick J. Bernal
_____

Patrick J. Bernal (*Admitted Pro Hac Vice*)
Joyce C. Williams (*Admitted Pro Hac Vice*)
MICHAEL BEST & FRIEDRICH, LLP
8300 Arista Place, Ste. 300
Broomfield, Colorado 80021
Phone: (303) 800-1580
Fax: (855) 732-0199
pjbernal@michaelbest.com
jcwilliams@michaelbest.com

Patrick J. Hickey (Wyo. Bar No. 7-5522)
MOYE WHITE LLP
16 Market Square, 6th Floor
1400 16th Street
Denver, Colorado 80202
Phone: (303) 292-2900
Fax: (303) 292-4510
patrick.hickey@moyewhite.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on December 29, 2021, a true and correct copy of this Response in Opposition to Defendant's Motion for Summary Judgment was served via the Court's CM/ECF system to all attorneys of record.

All counsel of record.

/s/ *Patrick J. Bernal*